TILSON (SHURLDS v.). See Case No. 12,-827.

---

## Case No. 14,054.

### The TILTON.

[5 Mason, 465.] [1]

Circuit Court, D. Massachusetts. May Term, 1830.

ADMIRALTY—PETITORY SUITS—WRECKED SHIP—SALE—EFFECT OF—BONA FIDE PURCHASER.

1. The admiralty has jurisdiction of petitory as well as possessory suits, to reinstate owners of ships, who have been wrongfully displaced from their possession.
[Cited in The Wave, Case No. 17,297. Cited in note in The Watchman, Id. 17,251. Cited in The Perseverance, Id. 11,017; Davis v. Child, Id. 3,628; Leland v. The Medora, Id. 8,237; The North Cape, Id. 10,316; Taylor v. The Royal Saxon, Id. 13,803; Ward v. Peck, 18 How. (59 U. S.) 268; Tunno v. The Betsina, Case No. 14,236; Thurber v. The Fannie, Id. 14,014; Grigg v. The Clarissa Ann, Id. 5,826; Snyder v. A Floating Dry Dock, 22 Fed. 686; Haller v. Fox, 51 Fed. 299.]

2. The admiralty has jurisdiction in case of a wrecked ship, to decree a sale upon application of the master.
[Cited in The Wave, Case No. 17,297.]

3. The master of a ship has not, in virtue of his office, any authority to sell a ship, except in cases of extreme necessity, where the vessel is wrecked, or unnavigable. &c.
[Cited in The Henry, Case No. 6,372; The Dawn, Id. 3,665; Joy v. Allen, Id. 7,552; The Lucinda Snow, Id. 8,591; Fitz v. The Amelie, Id. 4,838; The Bridgewater, Id. 1,-864; The Raleigh, 37 Fed. 126.]
[Cited in Prince v. Ocean Ins. Co., 40 Me. 487.]

4. If he sells without such necessity, the sale is invalid, notwithstanding he has acted with good faith, at least, where the contest is between the owner and the purchaser.
[Cited in The Henry, Case No. 6,372; U. S. v. The Etta. Id. 15,060; The Eliza Lines, 61 Fed. 313.]

5. Quære, how it would be between the underwriter on a policy, and the owner?
[Cited in Gloucester Ins. Co. v. Younger, Case No. 5,487.]

6. A wreck sale, made by authority of the statute laws of a state, is valid to pass the title to the property. where there is no owner or agent present to protect or claim the property.
[Cited in Coie v. The Brandt, Case No. 2,-978; Fitz v. The Amelie, Id. 4,838.]

7. Construction of the laws of North Carolina on this subject. A sale at the solicitation or order of the master is not a statute sale under those laws, binding the owner.

8. A statute sale, if fraudulent, will not bind the owner, unless in favour of a bonâ fide purchaser, for a valuable consideration, without notice, actual or constructive, of the fraud.
[Cited in The Henry, Case No. 6,372; Tufts v. Tufts, Id. 14,233· The Bridgewater, Id. 1,864.]

9. What is such notice?

10. The sale by an admiralty court of a wrecked ship, upon the application of the master and a survey made, is within its jurisdiction, but is not conclusive upon the owner or upon third persons.
[Cited in The Henry, Case No. 6,372; The Dawn, Id. 3,665.]

This was a libel, brought originally in the district court by George W. Otis & Jonathan Thaxter, of Boston, to obtain possession of three quarter parts of the schooner Tilton, alleging that they were the owners of the said three quarter parts, and that possession thereof was wrongfully withheld from them by the said Schenck, McCabe, & Smith. The claim and answer set up a title by purchase, in McCabe & Smith, to three quarter parts, and in Schenck, to one quarter, and set forth the facts connected with the sale and purchase. The replication denied the validity of the sale.

The principal facts were as follows: The schooner sailed from New York on the 18th of May, 1828, in ballast. bound to Conwaysborough, in the state of North Carolina; three quarter parts of her being owned by the libellants, Otis & Thaxter, and the remaining quarter part by Samuel Tilton, the master. In the course of the night of the nineteenth, she was stranded upon the beach near the banks of Chickamacomico; the next morning, Tilton made his protest before a notary public, and applied to a wreck commissioner, who examined the situation of the schooner, and at the solicitation of Tilton, advertised her to be sold on the thirty-first of the same month. At the instigation of Tilton also, a survey was had on her by three persons appointed by the notary, who, on the day of the sale and a few hours previous thereto, reported that the schooner ought to be sold, where she lay, for the benefit of all concerned. She was accordingly sold on the thirty-first, as advertised, by O'Neil, the wreck

---

[1] [Reported by William P. Mason, Esq.]

master, and was bid off by one Pharaoh Farrow, for the sum of $196.50. She was afterwards floated by persons employed by Farrow, and taken to a neighbouring harbour, where she lay about a month, during which time the master, Tilton, came on to Boston, and claimed his insurance; and after his return to Chickamacomico, she was taken to the port of Washington, in North Carolina, Tilton, Farrow, and O'Neil, going in her, where, on the 21st of July, Farrow conveyed one half part of her to Tilton, and a quarter part to O'Neil; the considerations expressed in the bills of sale corresponding with the sum paid for the schooner by him, and he conveying only such title as he derived from the sale by the wreck commissioner, O'Neil. She was then registered at the custom-house as the property of Farrow, Tilton, and O'Neil. On the same day, Farrow and O'Neil conveyed three quarter parts to McCabe & Smith, for $400 each; the bills of sale expressly excluding any warranty, further than for such title as they acquired by the bill of sale of the wreck commissioner. On the 12th of the following month of August, Tilton also conveyed his half part to McCabe & Smith, for about $1050. And on the same day, McCabe &. Smith conveyed one quarter part to Schenck, and appointed him master. A coasting license was afterwards taken out for the schooner, and she was repaired, and sent with a cargo to Boston, where she was seized by the libellants on the ground, that the sale made on the beach was altogether unnecessary, illegal, and collusive, and that they had, therefore, never been divested of their interest in the schooner.

Charles G. Loring, for libellants.
David A. Simmons, for claimants.

STORY, Circuit Justice. This is a libel in a proceeding in the admiralty, technically called a cause of possession, the object of which is to restore to the rightful owner the possession of a ship, which is unlawfully withheld from him, or of which he has been wrongfully dispossessed. It is well known to those, who are conversant with the original elements of the jurisdiction exercised by the courts of admiralty, that it extended its claims to all causes of a maritime nature, inclusive of questions of prize, whether they arose from contracts or from torts, the nature of the contract deciding the point of jurisdiction in the former cases, and for the most part the locality of the tort in the later cases. The subject was a good deal considered by me at an early period of my judicial life, in the case of De Lovio v. Boit [Case No. 3,776], and I am not yet convinced, that the doctrines therein stated are unfounded in a just view of the intrinsic rights of the admiralty, whatever may have been the measure dealt out to it with severe jealousy by the courts of common law. Godolphin, in his treatise on the Admiralty,

lays it down, that its jurisdiction is clear in "all matters that concern owners and proprietors of ships as such" (Godol. Adm. Jur. 43; Zouch. Adm. 93, etc., 98, etc., 102, etc.); and it is as broadly stated in Clerke, Praxis Adm. tit. 41, which is a book of undoubted authority. Suits in the admiralty, touching property in ships, are of two kinds; one called "petitory" suits, in which the mere title to the property is litigated, and sought to be enforced, independently of any possession, which has previously accompanied or sanctioned that title; the other called "possessory" suits, which seek to restore to the owner the possession, of which he had been unjustly deprived, when that possession has followed a legal title, or as it is sometimes phrased, when there has been a possession under a claim of title with a constat of property. 2 Browne, Civ. & Adm. Law, 113, 114, 117, 118, 397, 406, 430. Until a comparatively recent period, the court of admiralty exercised undisturbed jurisdiction over both classes of cases, as upon principle it is still entitled to do. Lord Stowell, in the case of The Aurora, 3 C. Rob. Adm. 133, 136, adverting to this subject, expresses himself in language not to be misunderstood as to the matter of right. "It is well known," says he, "that it was formerly held for a very long time, and down to no very distant period to be within the jurisdiction of this court to examine and to pronounce for the title of ships on questions of ownership. It was not until some time after the Restoration, that it was informed by other courts, that it belonged exclusively to them; since that time, it has been very cautious not to interfere at all in questions of this nature. Where the consideration of property arises incidentally, and in such a manner as is not disputed between the parties, the court can hardly be said to judge on the matter of property, as being a matter of question." In the case of The Warrior, 2 Dod. 288, he alludes to the same subject, in terms quite as direct. "It is certainly true," says he, "that this court did formerly entertain questions of title to a much greater extent than it has been lately in the habit of doing. In former times, indeed, it decided without reserve upon all questions of disputed title, which the parties thought proper to bring before it for adjudication. After the Restoration, however, it was informed by other courts, that such matters were not properly cognizable here; and since that time it has been very abstemious in the interposition of its authority. The jurisdiction over causes of possession was still retained; and although the higher tribunals of the country denied the right of this court to interfere in mere questions of disputed title, no intimation was ever given by them, that the court must abandon its jurisdiction over causes of possession." What his lordship here states, as to the actual exercise of the jurisdiction in former times, is borne out by

authorities. See Clerke, **Praxis** Adm. tit. 41; Radley v. Egglesfield, 2 Saund. 259; Edmonson v. Walker, 1 Show. 172; Zouch. Adm. 102; Godol. Adm. Jur. 31, 43, 44; Exton. Adm. 71; '2 Browne, Civ. & Adm. Law, 114, 430; Haly v. Goodson, 2 Mer. 77. In respect to petitory suits, the jurisdiction has been silently abandoned in England, for a considerable length of time; but in respect to possessory suits, it is still upheld by a constant and free exercise. And if in such possessory suits a question strictly of mere property arises, especially if it be of a complicated nature, the court ordinarily declines to interfere. But it does not always wholly abandon its ancient jurisdiction; and sometimes it will, in its discretion, retain the cause, and direct the question of title to be decided in some other tribunal, and mould its own decree according to the ultimate decision there. Lord Stowell, in the case of The Pitt, 1 Hagg. Adm. 240, alluding to this subject, says: "The court is certainly in the habit of transferring possession from the actual holder, sometimes by its own movement, sometimes at the instance of other courts, which have no direct powers for that purpose. But it considers itself bound to consider itself as moving within very narrow limits, if it proceeds at all, originally upon a question of title. It undoubtedly would not be inclined, in any case, to transfer a possession without regarding the title of the party, who claims the transfer. It must be satisfied, that he is potior jure; and it must be in cases extremely simple, that it acts on a merely preferable title to be reached by its own judgment." See, also, The Guardian, 3 C. Rob. Adm. 93; The Aurora, Id. 133; The Partridge, 1 Hagg. Adm. 81; Ex parte Blanshard, 2 Barn. & C. 244; The Experimento, 2 Dod. 38; The Warrior, Id. 288. Indeed, the court of admiralty in England considers itself, even in cases of possession, not merely as ministerial, but as having a large discretion or equity, and therefore entitled to refuse its interference, if it deems it inequitable or unjust. It will not hold an equitable title sufficient to justify its interposition against the legal title to restore possession; but it might, perhaps, sometimes deem such a title sufficient to restrain it from interfering with an existing possession under it. The Sisters, 4 C. Rob. Adm. 278, 5 C. Rob. Adm. 155.

I am not aware, that this distinction between petitory and possessory suits (somewhat analogous to the distinction in actions respecting the realty between droitural and possessory suits) has in point of jurisdiction, ever been admitted into the actual practice of the courts of the United States, sitting in admiralty. It stands, as far as I have been able to trace it, upon no principle, unless it be, that titles to property derived from the common law, shall be no where litigated, except in the courts of common law, a proposition, that, carried to its

full extent, would prostrate the entire jurisdiction of the admiralty in instance causes. Indeed, the titles to ships principally depend upon the maritime law, as recognised and enforced in the common law; and the admiralty does little more in most instance causes, than to carry into effect the declarations of the maritime law, so recognised and enforced. No doubt exists, that the admiralty possesses authority to decree restitution of ships wrongfully withheld from the owners. Ex parte Blanshard, 2 Barn. & C. 244. And if so, it ought to possess plenary jurisdiction over all the incidents. That was the clear opinion of Lord Hale, in Radly v. Eglesfield, 1 Vent. 173; Id. 308, which was afterwards confirmed by the whole court; and it was there said, that when the admiralty hath original cognizance of the principal matter, it hath also cognizance of the incidents thereto. The same case is reported in other books, and particularly in 2 Saund. 260, and 2 Lev. 25, where the doctrine is stated at large. It had been decided in the same way in the reign of Queen Elizabeth, (Anon., Cro. Eliz. 685,) and the doctrine is so reasonable in itself, that the difficulty is to conceive, how it could ever have been questioned. In the exercise of the prize jurisdiction, it has been constantly admitted to the largest extent.

In cases not strictly of prize, but partaking of their nature, as in cases of illegal captures in violation of our neutrality, the courts of the United States have never hesitated to inquire into and decide the title, however complicated. See Talbot v. Jansen, 3 Dall. [3 U. S.] 133; Del Col v. Arnold, Id. 333; L'Invincible, 1 Wheat. [14 U. S.] 257; The Alerta, 9 Cranch [13 U. S.] 359; The Neustra Senora de la Caridad, 4 Wheat. [17 U. S.] 497; The Antelope, 10 Wheat. [23 U. S.] 66; The Santa Maria, 7 Wheat. [20 U. S.] 490. In cases of salvage and bottomry, a like course has been adopted (The Mary Ford, 3 Dall. [3 U. S.] 188; The Adventure, 8 Cranch [12 U. S.] 221; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240), as well as in cases of seizure for forfeitures (The Mars, 8 Cranch [12 U. S.] 417; The Plattsburg, 10 Wheat. [23 U. S.] 133; The Antelope, Id. 66, 11 Wheat. [24 U. S.] 413, 12 Wheat. [25 U. S.] 546). But what is still more directly applicable, in cases of marine torts the supreme court has gone at large into the question of proprietary interest, and has moulded its final decree according to the ultimate rights established by the parties. Rose v. Himely, 4 Cranch [8 U. S.] 241, is an instance full of intricate and perplexing inquiries on this very point of title.

For myself, meaning to speak with all due deference for the judgment of others, I feel bound to confess my inability to perceive any sound distinction, as to the point of jurisdiction, between petitory and possessory suits. If there were a series of American decisions on the subject, which in point of authority

ought to control my judgment, I should cheerfully bow to them. But finding none, I adhere to the doctrine, that the admiralty possesses a rightful jurisdiction over both.[2] In cases like that before the court, I do not find, that Lord Stowell has felt himself absolutely constrained to abandon all jurisdiction in England, because a title arose under a sale of a ship by the master, upon the ground of necessity. See The Partridge, 1 Hagg. Adm. 81; 2 Barn. & C. 244; The Pitt, 1 Hagg. Adm. 240; The Experimento, 2 Dod. 41; The Warrior, Id. 288. In the case of The Warrior, 2 Dod. 288, he explicitly denied, that the court is to decline its jurisdiction in a cause of possession, on the mere averment of one of the parties, that there is a conflicting claim of title. One cannot, indeed, but feel the truth of the language of Lord Tenterden, that this jurisdiction of the court of admiralty is a most useful part of the jurisprudence of the country. Ex parte Blanshard, 2 Barn. & C. 244. As such, I cannot but think, that it ought not to be surrendered but upon principles too clear to admit of judicial doubt. My duty, therefore, compels me in this cause to travel over questions, which I would otherwise have gladly yielded up to other tribunals.

There is another point of no inconsiderable importance, upon which it is necessary to bestow some attention, before the court proceeds to a more exact consideration of the facts. It is, how far the master of a ship, virtute officii, is clothed with authority to sell the ship. There is no pretence to say, that he possesses such an authority under the ordinary circumstances of the voyage. And the only question is, how far he possesses it in cases of extraordinary unforeseen emergency, acting bona fide for the interest of all concerned. There appears to have been a good deal of reluctance on the part of the British courts to admit such an authority in the master, even under circumstances of serious peril and difficulty. Lord Hale is supposed to have decided against it, in the case of Tremenhere & Tresillian, 1 Sid. 452, which was referred to his decision. In Johnson v. Shippen, 2 Ld. Raym. 982, Lord Holt used language, which has been construed to

[2] In the laws passed in the colony of Virginia in 1659, 1660, there is one declaring, that the governor and council shall "have full power and authority of a court of admiralty, to cognoss, determine, and administer justice in all things pertaining to sea-fairing, that shall appertaine, happen, or fall out within the jurisdiction of this collonie, either between mariner and merchant or mariner and master, as likewise all complaints, contracts, offences, pleas, exchanges, assecurations, debts, counts, charter-parties, covenants, and all other writings concerning lading and unlading of shipps, freights, hyres, and all other business among sea affairs done on the water, and when within the limits of the jurisdiction of Virginia, or the laws and cognizance thereof, with the cognition of writs, the causes and actions of reprisals, of letters of marque, to take stipulations, cognitions, and instructions."

lead to a similar conclusion. I rather doubt, whether either of these cases justifies such an interpretation. There is a remark made in a very old reporter (Jenk. case 16, note,) to a very different effect. It is there said, "The master of a ship in case of danger and extremity may cast the goods into the sea; and in some cases sell the ship, although it does not belong to him, as in case of famine," &c. Lord Ellenborough, however, as late as the case of Hayman v. Molton (1803), 5 Esp. 65, laid down the doctrine with such unusual hesitation, that it is very expressive of his opinion of the then state of the law on that subject. "Where," said he, "a case of urgent necessity and extraordinary difficulty occurs, where a ship has received an irremediable injury, under such circumstances, the captain acting bona fide for the benefit of the owners, might sell the ship for the benefit of the owners. This is the disposition of my mind, but I cannot lay it down as positive law." The case of Reid v. Darby, 10 East, 143, had a tendency to throw still greater doubt over the whole matter, although it was finally disposed of upon another ground. To what is suggested in that case, as to the want of jurisdiction in the admiralty courts to decree the sale of a ship in a case of necessity upon an application of the master, I, for one, cannot assent. I agree, that in such a case the decree of sale is not conclusive upon the owner, or upon third persons, because it is made upon the application of the master, and not in an adverse proceeding. But I cannot but consider it as strictly within the admiralty jurisdiction. It is prima facie evidence of a rightful exercise of authority, but no more. The proceeding, being ex parte, cannot be deemed conclusive in favour of the party promoting it. Upon a question of this sort I should incline to follow other authorities, and to repose with more confidence upon those, who are accustomed to administer the maritime law in admiralty courts. It does not appear to me, that Lord Stowell, with all his habitual caution in entertaining jurisdiction, has considered such a sale an absolute excess of judicial authority. Looking to the language used by him in the cases of The Fanny & Elmira, Edw. Adm. 117, and The Warrior, 2 Dod. 288, 293, 295, I should draw the conclusion, that but for the controlling authority of the courts, which he was bound to obey, he would have affirmed the jurisdiction. See, also, The Lady Banks, 1 Hagg. Adm. 306. But see Morris v. Robinson, 3 Barn. & C. 196; Abb. Shipp. pt. 1, pp. 8, 11, c. 1, § 3; 3 Kent, Comm. 95.

The doctrine of the supreme court of the United States, as I gather it from the case of Janney v. Columbian Ins. Co., 10 Wheat. [23 U. S.] 411, 418, is, that this is properly a part of the admiralty jurisdiction. Mr. Justice Johnson there said, in delivering the opinion of the court, "In other parts of the world, it is very generally exercised as an

incident to the admiralty power; and the admiralty jurisdiction under our system, can only be exercised under the laws of the United States;" and he intimated a clear opinion, that congress might regulate the subject, either as one appertaining to trade and commerce, or within the admiralty jurisdiction. Shortly after the case of Reid v. Darby was decided, the same question respecting the right of the master to sell in a case of necessity came before Lord Stowell for consideration; and that distinguished judge, with his accustomed felicity of reasoning, maintained the affirmative. The Fanny & Elmira, Edw. Adm. 117. In subsequent cases, his judgment appears to have reposed with confidence on the same decision. The Warrior, 2 Dod. 288; The Pitt, 1 Hagg. Adm. 240.

The doctrine in England seems at last, after a good deal of intermediate discussion, to have settled down in this result, that the master has an authority in a case of extreme necessity, acting with good faith and for the general benefit of all concerned, to sell the ship. That is the clear exposition of the law in Idle v. The Royal Exchange Assur. Co., 8 Taunt. 755; Read v. Bonham, 3 Brod. & B. 147; and Robertson v. Clarke, 1 Bing. 445. But at all events, as between the owner and the master, it is not sufficient that the sale be one of good faith on the part of the master, and for the benefit of all concerned, unless there be an urgent necessity. See Read v. Bonham, 3 Brod. & B. 147. Whether the same rule applies as between the owner and the underwriter on a policy of insurance, admits of more doubt Lord Chief Justice Dallas, in his elaborate judgment in Idle v. Royal Exchange Assur. Co., 8 Taunt. 755, strongly maintained, that in such a case it was sufficient to justify the sale, that there was good faith in the master, and that the sale was for the benefit of all concerned. Id. But that decision seems not to have been sustained, or at least not firmly established in more recent cases. See Robertson v. Clarke, 1 Bing. 445; Maeburn v. Leckie, Abb. Shipp. pt. 1, p. 6, c. 1; Cannan v. Maeburn, 1 Bing. 243.

The doctrine recognised in America, so far as it has fallen under my observation, substantially conforms to that in England, and limits the right of the master to sell to cases of urgent necessity. So it was held in Gordon v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 249, and the like opinion may be deduced from cases in the New York Reports. Fontaine v. Phoenix Ins. Co., 11 John. 293; Center v. American Ins. Co., 7 Cow. 564. My learned brother, the late lamented Mr. Justice Washington, in Scull v. Briddle [Case No. 12,569], distinctly affirmed the right of the master to sell in a case of necessity, in a foreign country; but he thought it unjustifiable in the country, where the owner lives. This qualification of the rule seems to me not maintainable, where the necessity is clearly made out, though the circumstance, that the sale is in the country of the owner, may lead to very close watchfulness as to the degree of that necessity.

Without intending to commit myself in a case between the owner and underwriter, my judgment is, upon the most careful survey of the authorities, as well as upon general principles of law, that the master has a right to sell the ship in cases of urgent necessity. But at least, as between the owner and a purchaser at the sale, the title of the former is not devested, unless such necessity exists, notwithstanding the master may have acted with entire good faith, and in the exercise of a sound and honest discretion. I am happy to have the deliberate opinion of Mr. Chancellor Kent, in his learned Commentaries in support of this doctrine. 3 Kent, Comm. 134.

It may be justly inferred, that the general maritime law, as recognised in foreign nations, is not more favourable to the power of the master. The Consolato del Mare (article 253) contains a provision permitting the master to sell the ship, if she becomes from age unseaworthy, and by parity of reason, on account of innavigability from any other cause. On the other hand, the Laws of Oleron, the Laws of Wisbuy, and the Commercial Ordinance of Louis XIV, absolutely prohibit the sale of a ship by the master in all cases. Laws of Oleron, art. 1; Laws of Wisbuy, art. 13; 1 Valin, Comm. lib. 2, p. 444, tit. 1, art. 22. Valin sturdily contends for the policy of this prohibition, remarking, "Vocabulum enim istud, maitre, intelligendum est tantum de peritiâ in arte navigandi, non de dominio et proprietate navis;" and urging the general prevalence of fraudulent sales. The modern code of France contains a very proper exception of the case of innavigability of the ship; but subject to this, the modern law of France enforces the antecedent prohibition of the old law in an expressive manner. Code de France, art. 237; 2 Boul. P Dr. Com. p. 85, § 17; 3 Socre Esprit du Code Comm. p. 120, art. 237.

I adopt then the argument urged at the bar, that it must be proved, that there was a pressing necessity to justify the sale; and I go farther and hold, that if such necessity existed, the sale, to bind the owner, must be conducted with entire good faith, and must be optima fide and above exception. And this leads me to the consideration of another topic, much discussed at the bar, how far the laws of North Carolina, on the subject of the sale of wrecked vessels, give validity to the title thus acquired. Those laws, as far as I have been able to collect their import from the statute book of the state, seem founded in a sound policy, and in furtherance of the principles of justice and humanity. Acts N. C. 1801, c. 599; Id.

1805, c. 689; Id. 1817, c. 953; Id. 1818, c. 975, of the authorized edition of 1821. They provide for the appointment of wreck commissioners in certain maritime districts, to assist vessels stranded, or in danger of being stranded. Where any vessel or other property is cast ashore, "without any person present to claim the same as owner," the commissioner is authorized to take possession of them and, under certain circumstances, to advertise them, and, if not claimed within twelve months, then to sell them. But if perishable, the same may be sold after public advertisement for a period not less than ten, nor more than twenty, days. The commissioners are punishable for any fraud or neglect of duty, and are required to give bonds for the faithful discharge of their duty. Provision is also made, that the commissioners shall be deemed proper officers to advertise and sell at public auction any cargoes, which may be stranded or cast on shore in their respective districts, "except the captain, owner, merchant or consignee shall choose to superintend such sale himself, or to remove the property without selling it." This latter provision presupposes the presence of the owner or his agent, and does not impart an original authority to the commissioners to sell in invitum; but clothes him with authority to act as auctioneer in cases of an implied or express assent of the owner, or his agent. The terms of the act confine the authority to the sale of cargoes; whether it has ever been extended by implication to ships, I do not know. It is most probable, that the omission to include ships was a mere mistake, originating in the very common imperfection of a careless and hasty legislation. But unless there were some judicial decision of the state tribunal to the contrary, I should consider the error one, which could not be supplied by the construction of a court, extending the words beyond their import, but to be remedied by the act of the legislature. It is not material, however, to consider this point, because every sale made under this clause, must be considered as authorized by the owner or his agent; and consequently, it derives its force and validity from that circumstance, as a sale by procuration. It is in no just sense a statute sale, where the act of the commissioner is conclusive upon third persons, virtute officii; but it is open to all the considerations belonging to all other sales, made at the instance of the parties in interest, by persons having a public authority to conduct sales. But where the sale is made by a wreck commissioner in cases falling within the language of the law, "without any person present to claim the same as owner," a very different interpretation ought, as I conceive, to be given to his act. He is there made, virtute officii, the agent of the owner for public purposes, and his authority to sell,

if exercised in good faith, is conclusive to transfer the title to the property to any purchaser at the sale. No one can doubt the legal authority of a nation to provide for the transfer of property under circumstances, where there is no known owner to provide for its safety; and least of all ought such an authority to be questioned, where the property is of a perishable nature. I meddle not with the question how far any state in this Union can legislate, so as to interfere with the admiralty and maritime jurisdiction confided to the government of the United States, by the constitution. But subject to that consideration, the general authority would seem to be undeniable, as an attribute of sovereignty. See Grant v. M'Lachlin, 4 Johns. 34. Such a sale, however, though generally conclusive upon the title of the owner, is so only in cases of good faith. A statute sale by a public officer may be impeached, as, indeed, more solemn acts may be, for fraud; and the purchaser can protect himself only by showing, that he is a bona fide holder, without notice of, or participation in, the fraud. A fortiori, a sale made by the consent of the owner or his agent, may be avoided for fraud.

The circumstances of the present case do not call upon the court for a more minute expression of its opinion upon this point. But as a corollary from what has been said, it may be deduced, that the commissioner cannot, himself, become a purchaser, in whole or in part, at such a sale. He is a trustee, acting in a public capacity, and the law will not permit him to evade his own proper duties, or expose him to the temptation of a corrupt influence in conducting the sale, from motives of private interest. This is a salutary principle of public policy, and has been often applied with severe exactness to public as well as private trustees. Sugd. Vend. (17th. Ed.) p. 588, c. 14, § 2, and cases there cited. The same principle applies with quite as much if not more force to the master, when he acts as the agent of all concerned under an authority, superinduced by an urgent necessity in the course of a voyage. Under such circumstances, if he orders a sale, he cannot become a purchaser at the sale; and if he does, his title may be avoided at the election of the original owners. Church v. Marine Ins. Co. [Case No. 2,711]; Barker v. Marine Ins. Co. [Id. 992]; Copeland v. Mercantile Ins. Co., 6 Pick. 198; Chamberlain v. Harrod, 5 Greenl. 420. There is, I admit, no positive disability on his own part, or on that of the wreck commissioner, to become a purchaser from the real purchaser, after the sale. But in such cases, there is a most suspicious watchfulness exercised on the part of the law, to search the transaction to the very bottom; and nothing but entire good faith, uberrima fides, on their part, will suffice to give validity to their title.

The Warrior, 2 Dod. 288; The Fanny & Elmira, Edw. Adm. 120; Hayman v. Molton, 5 Esp. 65.

In the present case there is the less room to doubt as to the authority, under which the sale was actually made, because in the advertisement for the sale of the vessel by the wreck commissioner, it is expressly stated, that the sale was made "by order of Capt. Tilton, late master, for the benefit of all concerned therein;" and the bill of sale by the wreck commissioner to the asserted purchaser, also expressly states, that the vessel was exposed "to public auction by the solicitation of" &c. [the master.] This makes it very plain, that all parties understood it to be a voluntary sale, under the sanction of the master, and that the wreck commissioner derived his authority from that source.

In this view of the matter, an objection has been suggested to my mind, though I do not remember that it was insisted on at the bar. It is this,—if the master has an authority to sell in cases of necessity, he must still sell in the manner prescribed by law, as the agent of the owner, or his act will be void. If he sells as agent, the bill of sale must be in the name of his owners, and not in his own name. He cannot depute another person for this purpose; and even if he can, still that person must execute the bill of sale in the name and as the agent of the owner, and not in his own name. In the present case, the bill of sale was executed in his own name by the wreck commissioner, and not in the name of the master or owner. It is, therefore, in legal contemplation, a mere nullity, and cannot pass any title. Such is the objection, and there is a good deal in the case of Reid v. Darby, 10 East, 143, which may be urged in support of it. But upon a full consideration of it, my opinion is, that, however justly it might apply in the case of Reid v. Darby, where the question was between British subjects under the British registry act, (as to which I decide nothing,) it is not generally applicable to cases of sales by necessity in a foreign country, where registry acts of a like strict nature do not exist, or bind the parties to the sale. It seems to me, that the agency of the master in cases of necessity, is an agency arising by operation of law. His power to sell is not derived so much from the supposed assent of the owner, as from the principles of law, to prevent a total loss of the property. The master acts, virtute officii, as master, and being in possession of the property, the law treats him as one capable of selling in his own name, but for the benefit of the owner. If any assent of the owner is to be presumed, it is an assent to sell in his own name in such cases, if that is, (as it is believed to be,) the usual, if not the invariable course. Foreign purchasers in a foreign country can have no knowledge of the persons, who are the real owners; or if they may have knowledge of those, who were owners at the commencement of the voyage, they can have no knowledge of any intermediate transfers by sale, by death, by bankruptcy, or by operation of law; and if no sale would be good, except made in the name of the persons, who were the real owners at the time, many of the purchases made in cases of sales of necessity would be liable to be avoided. Sales of all other property of the owners, except ships, made by the master in his own name, would be generally deemed sufficient to pass the title, if the sale were otherwise justifiable. Foreigners treat with him, as they do with factors in like cases, as owner de facto. My opinion, therefore, is, that in a case of sale, strictly of necessity, the master may give a sufficient title in his own name, as by operation of law substituted owner pro hac vice, or at least as an agent capable of passing the possession and property by a bill of sale executed in his own name. It is far from being universally true, that a person, who sells as agent, must always sell in the name of his principal in order to give validity to the transfer. A factor sells in his own name; an auctioneer commonly sells in his own name; and so a master selling perishable goods in cases of necessity, where he is not consignee; so a sheriff, where at common law he sells wrecked goods, which are perishable. See 2 Inst. 168. If then the master might sell in his own name, and the sale is made with his privity and consent by a person, who usually gives a bill of sale, as wreck commissioner in his own name, it is clear to my mind, that the master is as much bound by such a sale so sanctioned by him, as if the bill of sale were in his own name. If the owner had authorized the wreck commissioner to sell, and give a bill of sale of the ship in his own name, would it be indured, that he should afterwards reclaim the property, because the bill of sale was not in his, the owner's, name? Would it not be deemed a perfect sale, binding him at law as well as in conscience and equity? I think it would, and that any other doctrine would encourage every sort of fraud upon innocent purchasers. If the owner will stand by, and see his own property sold, as the property of another, courts of equity have said, that he shall in many cases, for the suppression of fraud, be bound by it. And there are many cases even at law, where a party will not be allowed to set up his legal title against an innocent purchaser, where the owner has connived at the sale, or has acted fraudulently. But in a court of admiralty, which endeavours to regulate its doctrines by principles of equity, a party coming thither to seek redress, or to obtain possession of property, will not be permitted to avail himself of its jurisdiction, or authority, to defeat a clear equitable right by insisting on an inequitable legal right. The court will withhold its interference in such

a case. In this view of the objection, it would not be material, even if it had a better legal foundation than, I think, it really possesses. For, if the sale were necessary, and the transaction in all other respects optimâ fide, the defect of a legal execution of the papers would not entitle the owner to a decree of possession.

Having discussed the legal principles applicable to cases of this nature, let us now see, what is the real posture of the facts in the present case. The schooner Tilton belonged to Boston, and was owned by the libellants and the master, (Capt. Samuel Tilton;) the former owning three quarters, and the latter one quarter of her. She was duly enrolled and licensed at Boston for the coasting trade, and sailed from New York on the 18th of May, 1828, bound to Conwaysborough, in the state of North Carolina, on a contract to take in freight there. On the night between the 19th and 20th of the same month, she was, by the perils of the sea, stranded on the coast of North Carolina upon a beach or sandbank, part of the bank of Chickamacomico. On the morning of the next day the master and crew got ashore, and the master, upon consulting some of the inhabitants, there being a small fishing settlement in the neighbourhood, concluded to apply to the wreck commissioner appointed by the government, for that part of the coast, and to authorize him to sell the vessel, as she lay on the bank. She was accordingly advertised by the wreck commissioner for sale on the 31st of May, and was sold on that day for the sum of $196.50, including all her tackle, apparel, and furniture. A survey was made on her on the day of sale, and not before. The sale was conducted by the wreck commissioner, and the nominal purchaser at the sale was one Pharaoh Farrow, to whom a bill of sale was given by and in the name of the wreck commissioner, dated on the same day. It recites the original enrolment, and contains a special warranty, warranting the title "according to his authority as commissioner of wrecks," against all persons. The sale was made between 12 and 2 o'clock of the day. It is admitted, that on the same day, after the sale, the wreck commissioner purchased one quarter, and the master (Tilton,) one half of the vessel, at the price she was bid off at, and immediately afterwards, Farrow departed, and the wreck commissioner and Tilton (the master), and the mate, (the rest of the crew having been dismissed a few days before,) and about eight or ten other persons, hired for the occasion, went to work to endeavour to get the vessel off, and the wind and tide favouring, she was accordingly got off that night; and her leaks being stopped, she was carried by the master and other persons through Ockracocke Inlet, and brought to anchor in Pamlico Sound, on the inner side of Chickamacomico banks, where she remained for about one month. In the intermediate time, and before the vessel left Chickamacomico, Capt. Tilton returned to Boston, there being an insurance there upon the vessel for the benefit of all the owners, to the amount of $3,000, and he endeavoured to procure payment of his share of it; but the underwriters resisted payment upon the ground, as it is understood, that the abandonment was not good, it not being a case of a total loss. Capt. Tilton then returned by the way of New York, to Chickamacomico, and there (according to his own account, in a letter dated afterwards at Washington, on the 27th of July, 1828,) he went on board of the schooner Tilton, and took her under his command to Washington, in the state of North Carolina, where she remained a short time, and underwent some repairs. While there, the original ship papers were deposited in the custom-house; and on the 21st of July, 1828, Farrow executed a bill of sale, reciting the original enrolment, of one quarter of the schooner to the wreck commissioner, and another bill of sale with a like recital, of one half to Tilton, (the master,) pursuant to the original agreement with them on the day of sale, and for a proportional sum of the original purchase money. On the same day, Farrow procured the schooner to be registered in the custom-house at Washington, as the joint property of himself, the wreck commissioner, and Tilton. On the same day (the 21st of July,) the wreck commissioner, by a bill of sale of that date, reciting the register, and that Tilton was master, conveyed his one quarter part (for which he had given $49.12½ only), to McCabe & Smith, (the claimants,) for $400; and on the same day Farrow, by his bill of sale of the same date, reciting the register, conveyed to McCabe & Smith, his remaining quarter part, for $400. McCabe & Smith, thus became the owners of one half of the vessel, and Tilton of the other half. It is also material to state, that the bills of sale from Farrow to the wreck commissioner, to Tilton and to McCabe & Smith, warranted the title in a special form only, "against all and every person and persons whomsoever, as far as I can do by virtue of the title to the said schooner, vested in me by the bill of sale from the commissioner of wrecks, dated the 31st of May, 1828, and no further." The bill of sale from the wreck commissioner also, to McCabe & Smith, warranted the title "so far as I can do by virtue of the title to said vessel, vested in me by bill of sale from Pharaoh Farrow, bearing date the 21st of July, 1828, and no further." On the 12th of August, 1828, Tilton conveyed his one half of the schooner to McCabe & Smith, for $1050, reciting in the bill of sale the register, and that he, Tilton, was then master; and on the 23d of the same month, McCabe & Smith, by a bill of sale reciting the register and that Tilton was master, conveyed one quarter part to Schenck, (the other claimant) for the sum of $500. These two last

bills of sale from Tilton, and McCabe & Smith, contain general covenants of warranty to the vendees against all persons. It is under the conveyances thus set forth, that the present claimants assert their title to the entirety of the schooner. The schooner was on the same day duly enrolled and licensed for the coasting trade, and soon afterwards sailed from Washington for Boston, under the command of Schenck, and after her arrival there was arrested upon the admiralty process, by which she is now before this court.

Such is the general outline of the facts, as they are presented in an historical order. And the questions growing out of them and the other proofs in the cause, which have been most acutely and elaborately discussed at the bar, are these: (1) Was there in the present case any necessity, which would justify the master in making the sale? (2) If there was, was the sale actually made bona fide, and without fraud by the master, or with his privity and consent? (3) If not, are the present claimants entitled as bona fide purchasers for a valuable consideration without notice of the fraud, to be protected in their actual title under the sales made to them? If the first question is decided against the claimants, their title is at an end, for it is then the case of sale made by one possessing no competent authority. If on the other hand the sale was a sale of necessity, then if fraudulently made, it cannot avail the claimants, if they had notice of the fraud, or were fairly put upon inquiry by the nature of their title and the circumstances, under which they took it. If they are bona fide purchasers of the title without any notice, constructive or actual, of any fraud in the sale, then, upon the general principles of law, their title stands firm and purged of the fraud.

In the first place then, was this a case where an actual necessity existed for the sale, in the sense, which I have already endeavoured to explain in the former part of this opinion? It is material to state, that the onus probandi here rests on the claimants. They are to establish beyond any reasonable doubt, that there was such a necessity, otherwise their title never took effect. The libellants stand upon their original title, and until that is displaced by another, clearly proved, they may rest upon it. Now, upon the first blush of the case we have the fact, that the vessel was not fatally injured, but she was got off at the first effort seriously made for that purpose, and at a very trifling expense, and she did not sustain any great injury from the stranding. Considering the length of time she lay on the beach, and her exposure to the inroads of the sea, if it were as great as the witnesses testify, her injury during the period was marvellously small, and her preservation somewhat remarkable. I am aware, that there was a fortunate concurrence of favourable wind,

and tide, and sea, at the time when she was actually gotten off; but looking to the tale told by the log-book, it is by no means certain, that if similar efforts had been previously made, they would not have been equally successful. The season of the year was mild and favourable; the means, at least for some strenuous efforts, were at hand; and at a comparatively small distance there were men and means without the hazard of great expense, which had in other cases been found ready and adequate and successful. I admit, that we are not in a case of this nature to look solely to the event. Cases have occurred (and they may again occur) of such utter hopelessness, that in point of reason and common sense, a sale would seem to be instantly required without any effort of relief; and yet by some extraordinary circumstances beyond the reach of human foresight, the property has been finally redeemed from the peril, and has survived the disaster. In such cases the sale is nevertheless justifiable, and binding upon all parties. But where the relief has been in fact procured by the application of ordinary means within reach, we have a right to expect, that the necessity for sale should be such as could not admit of any reasonable doubt or delay; that the master ought not in common prudence to have made any efforts, and that the preservation of the vessel is to be looked upon as a piece of good luck and rare fortune, rather than of superior judgment, or skill, or enterprise.

Now, in the present case, no effort was in fact made by the master to relieve the vessel, (for I lay aside his abortive attempt by hoisting the sails, when he had no adequate assistance on board,) from the first moment of stranding up to the time of the sale, a period of eleven days. The vessel was a valuable vessel, insured for $3000, and certainly worth from $2000 to $2500. He was upon the coast of his own country, and not upon a barbarous or inhospitable foreign shore. He was within a short distance of several commercial ports, where supplies might have been obtained, or at least sought. Upon the very spot there were men enough to aid him in any reasonable efforts to get the vessel off, and at a reasonable price. It is not pretended, that the neighbouring population either did refuse, or would have refused any such service. They never were asked. And if they had refused, even if the laws of North Carolina on this subject had slumbered, there were men at no great distance, who had been accustomed to such services. What advice the master took does not appear; or whether in reality he took any entitled to much weight. The wreck commissioner denies having given any advice to sell, and the notary, upon whom he seems to have relied, speaks pointedly to the danger of the vessel, but he does not seem to have been the leader of the plan of sale. If the master was of opinion, under existing

circumstances, that it was best to sell; still as the sale was to be deferred for ten days, what was there in the meantime to prevent him from taking some steps and making some preparations to relieve the vessel, if a favourable time should occur? He could not but know, and so is all the testimony, that the vessel in her present state, if she could not be got off, would not sell for more than the value of her materials, of her sails and rigging and furniture, and there would not be any new hazard from the experiment. Every day's delay in the sale was adding something to the risk of getting the vessel off, and there was some motive therefore, to sell at once, or to attempt her relief. The weather, too, might at that season of the year be presumed to be favourable, and in point of fact during the intervening period it was so. But from the very first, the master declined all efforts, and he dismissed his crew before the sale, and remained in an utter state of inaction until roused after the sale was made. Let us put the question to ourselves, whether a master, honestly bent towards the interest of his owners, as well as his own, would, if the vessel had been uninsured, have conducted himself in this manner? The master's subsequent conduct was so disingenuous towards both the owners and underwriters, that it is somewhat difficult to escape from the conclusion, that he had some sinister motive at bottom. It is true, that his subsequent conduct ought not to prejudice the claimants, who were not parties to his acts, but it is impossible wholly to disentangle his acts from one another. Why should he have concealed, both from the owners and underwriters, his purchase after the sale?

Then, what was the state of the vessel? She was on a sand beach, buried, in part, in the sand, and accessible on one side at least to the tide. The amount of injury to her was not great. Some tree-nails are said to have been started, which, however, were easily replaced. It is said, that some of the planks of her bottom were started, and so it is stated in the protest; but that statement upon the whole evidence is, to say the least of it, extremely doubtful. It is not made out by evidence, omni exceptione major. It is encountered by opposing testimony, which is at least as disinterested, and of no inconsiderable positiveness, as well as weight. Her fore foot was off; but that was not very difficult to replace. She leaked considerably, and some oakum was started; but she was not unmanageable. What is decisive on this head is, that with some small repairs she reached Boston, and was there afterwards found by ship-wrights, who had repaired her but a short time before her disaster, very little hogged, and in their opinion nearly, if not quite, as strong and sound, as she was before the voyage. She has since performed a voyage with a heavy cargo, without complaining.

The survey, which, strangely enough, was not called until the day of sale, and therefore could have had no influence upon the master to sell, does not represent the injury to the vessel to be very serious. The surveyors say, that they found the vessel "high upon the beach with the larboard bilge much injured, and in all probability injured in the starboard bilge also, as that part lieth down in the sand, and therefore recommend Capt. Tilton to sell the vessel and materials." It is not a little remarkable, that the survey states no particulars of the injury, although in such instruments, it is usual, and important, to enumerate them at large. If by the bilge being "much injured," it was meant, that the bottom was broken in, or the timbers displaced, why was it not said so? There is no satisfactory proof, that the vessel was, in reality, bilged, in the nautical sense of the term. And there is some reason to believe, that the North Carolina testimony has incautiously, if not studiously, exaggerated the injuries from the stranding. The principal repairs at Washington seem to have been of no extraordinary a nature. The shipwright, who repaired her, states, "that he there hove her down, examined and repaired her; he found many of her tree-nails in the bottom started an inch or more; her fore foot all off; the oakum in her seams somewhat started; her keel hogged about six inches; one of the channel benches was carried away, and her tiller was broken. The vessel appeared to him to be very strongly built, and to have undergone a great deal of hardship by chafing of her planks, and the starting of her tree-nails. He in repairing her had to drive many spikes into her bottom, better to secure where her tree-nails had been started." Another witness (Whittier) adds, she had a new mainmast put in, and was graved and repaired. Neither of them states, that any plank in the bottom was started.

But the statement of the injury and repairs, even as thus exhibited by the shipwright at Washington, is brought into serious question by the testimony of the witnesses, who afterward examined and repaired her at Boston. The result of that testimony is, that the planks and tree-nails could not have been started in the manner stated; that the planks of the bottom were not chafed, or the seams caulked; and that there was no hogging of the vessel beyond what ordinarily belongs to vessels of her age and size. They admit however, that there was a new forefoot. I do not say, that this last testimony is more worthy of credit than the former; but such a conflict necessarily diminishes the confidence, which the court would otherwise repose in the former. It leaves behind it a lingering suspicion, that there has been some effort to exaggerate the injury to the vessel, or some want of caution in the recollection of the witnesses.

Then, as to the local position of the vessel.

She was certainly on a very dangerous and exposed shore, and open to the rake and full violence of the sea in an easterly storm. It is also in proof, that a large majority of vessels stranded on that coast are not got off, or at least are not got off, until after they are sold. The banks too are thinly inhabited; and it is not too much to presume, that the inhabitants have an interest to discourage efforts to get them off, if not to obstruct such efforts. But the vessel was undoubtedly safe in her position, unless an easterly storm came on. There is no evidence, which establishes, that she might not have been got off by proper means. On the contrary, the general concurrence of the testimony is, that she might have been relieved by getting her on ways and launching, but not in any other manner. Nevertheless, she was got off in a different manner, and by the use of her sails and shores. The expenses of an attempt to get her on ways, and launch her, do not appear to have been disproportionate to the object, or very great, and I cannot but think, that under all the circumstances, the master ought to have resorted to it. The winds and the weather were not unfavourable for it. Why he did not make any such attempt is not satisfactorily explained, for it is not shown, that the means were not within his reach. One cannot but perceive, that being fully insured, he might not have any strong personal interest to stimulate his exertions. But on the other hand, the expenses of a trial, even if unsuccessful, must have been borne by the underwriters. The means to secure such expenses were in the hands of the master by a pledge of the materials, and by the lien given for such services by the general maritime law, even if the master could not, under the circumstances, have obtained funds upon the credit of the owners and underwriters.

The circumstances also attendant upon the sale are not such as would lead the court to place implicit confidence in the master's judgment and character, either as to the necessity or good faith of the sale. The proceeds of the sale were $196.50, a sum wholly disproportionate to the real value of the rigging and furniture, independent of the hull. The real value of the cables and anchors and other moveable materials could not have been less than $500, and was in all probability more, if not upon the spot, at least in any neighbouring commercial port, to which they might have been transported. The master might have bid them in at the sale, for the benefit of the owners and underwriters, to whom they must have been far more valuable. It is difficult to see, why he did not, unless he had some private sinister interest. He and the wreck commissioner became confessedly purchasers on the same day, immediately after the sale, of three quarters of the vessel; and Farrow, the nominal purchaser, then disappeared, and did not again connect himself actively with the vessel or

her fate, until after she arrived at Washington. As soon as the purchase is made, the master and wreck commissioner begin their efforts to get her off, nay the efforts seem to have been begun before, and in a few hours their success is complete. The master returns to Boston, and studiously conceals from the other owners, as well as from the underwriters, that he had acquired any new or superior interest under the sale, nay, affirming that he had no interest in the purchase of the vessel under the sale. Failing to obtain payment of the insurance, he returned to North Carolina, and there took command of the vessel, then lying in Pamlico Sound. Although he and the wreck commissioner had purchased on the day of sale, they had no title from Farrow until the time (21st July) when it became necessary to change the papers at the custom-house, at Washington. For aught that appears in the case, up to this period a profound silence had been observed by all the parties as to the interest of the master, if not of the wreck commissioner. The latter appears as owner, only for the purpose of disposing of his share to the first purchaser he can meet. The vessel was sold at Washington, without repairs, for $1850, and of this sum the wreck commissioner received $400, and the master $1050.

It is said, that there is no proof that the sale was fraudulent, or that the master or wreck commissioner had made any bargain before the sale with Farrow; and that they are not by law prohibited from becoming sub-purchasers after the sale. Admitting that there is no absolute disability on their part to become sub-purchasers after the sale, still, in a transaction like the present, they must disprove their antecedent connexion with the sale in the fullest and most unqualified manner. The presumption of law is against them. The presumption of fact, in the absence of all controlling circumstances, is almost irresistible. It is for the furtherance of common justice and good faith, that persons in their situation should be compelled to purge themselves from every imputation of fraud, before they are permitted to derive any interest in trust property, which they undertake to sell, and which they may be tempted to sacrifice. In the present case it appears to me, that the interest of the owners and underwriters was wholly sacrificed. In respect to the master, acting as an agent for all concerned, I have very great doubts, whether he could become a purchaser at all without an option in his employers to take the beneficial interest to themselves. See Chamberlain v. Harrod, 5 Greenl. 420. Lord Stowell in the case of The Fanny & Elmira, Edw. Adm. 117, 120, said: "The fact that the master afterwards became a subordinate purchaser under the purchaser at the sale, of one fourth part of the vessel, and at the price, which he himself had given for her, smells rank of collusion." The same circumstances occur here in a stronger form, and the

subsequent conduct of the master and of the other parties to the sale fortifies every unfavourable conclusion. They could scarcely be ignorant of his motives for his return to Boston, or of his intentional concealment of the transactions at the sale, and immediately succeeding it. They connived at it, if they did not participate in it. Their subsequent conduct has no tendency to disarm suspicion. If every thing was in entire good faith, why should the bill of sale to the wreck commissioner and the master have been withheld until after the master's return from Boston; and why did Farrow and the commissioner then sell with special warranty, referring back to the wreck sale? If the master's conduct was honest, why should he have scrupled to receive a special warranty from Farrow, and have required some urging and argument to take it? Why should he have written such a disengenuous letter to the owners, under the date of the 27th of July, disguising and concealing all the material facts? I cannot admit that there is no proof of fraud in the sale. On the contrary, it seems to me difficult to avoid the conclusion, that the facts of the case afford very strong presumptions of fraud. And these presumptions go farther, and cast a shade over the other parts of the case. They bear with no inconsiderable force upon the question of the necessity of sale, for if there was a fraudulent combination at the sale, it is easy to see, that means could be found to make out the necessity. Fraud, therefore, in such a case, is not to be treated as an independent fact. but as a fact, which travels along with the transaction in all its stages, to justify doubts, and to withdraw confidence.

There are many other topics, which have been adverted to by the counsel on each side, to sustain or defeat the defence. I do not go over them, because whatever may be their influence, either jointly or separately considered, they do not materially affect the conclusions, to which my mind has arrived. The claimants have failed to satisfy my mind, that the sale was one of necessity, and still more so, that such as it was. it was a sale free from fraud. In the former view, the title of the claimants wholly fails, whatever may be their innocence or want of knowledge of the defects of title. In the latter view, it would be necessary to show, that they had notice of these defects.

I acquit the claimants of all connexion with any fraud, or participation in it. I do not doubt, that they are bona fide purchasers. But I am not satisfied, that they had not constructive notice of all the defects of title, at least so far as to put them upon inquiry. In the first place, they purchased with a full knowledge of all the antecedent history of the vessel. The ship's papers then in the customhouse. and recited in their own title deeds, showed, who were the original owners, and that Tilton was part owner and master. The other papers showed the manner and consid-

eration of the wreck sale, and the purchase of the wreck commissioner and the master for a proportionate sum of the original price; and this long after the vessel was sold at Washington. They showed, that Tilton was still master, and claimed to be owner of one half of the vessel, under a sale made by his own order and solicitation. They showed that the master was personally a great gainer by the sale. Their own title deeds also referred them to all the other papers, and pointed out the fact, that the other sub-purchasers stood upon a special warranty, and they were contented to take from them a special warranty. It is well known, that the general custom is to give a general warranty, and any exception naturally excites suspicion, and implies doubt. The party, who accepts such a title, is presumed to inquire into and to take the chances of any defect upon himself. It has been suggested, that McCabe & Smith never examined the bills of sale, and were ignorant of the fact of a special warranty. But, how can this be made out? The bills of sale were so drawn by the deputy collector, according to the instructions of one of the parties; and the deputy admits, that he never knew of a case of special warranty before. It was not then an unadvised act of the scrivener. The bargain was made before the parties came to him, and therefore he knows not what had previously passed in respect to this subject. But surely, it cannot be permitted to a party to set up ignorance of the contents of a bill of sale executed in his presence, and under which he asserts his title. The law presumes, that he has read it, or that he knows what its contents ought to be. It is not now pretended, that the vendors meant to give bills of sale with a different warranty. There was no mistake on their part, and there is no evidence, that McCabe & Smith contracted for a different title. When they subsequently purchased of the master his half of the vessel, they took a bill of sale with general warranty, and this precaution is not without its weight in giving a construction to the former special warranty, which could scarcely have passed without the observation of all the parties in interest, after it had attracted the attention of the master.

It appears to me then, that McCabe & Smith do not stand in the situation of parties, who purchase without knowledge of the actual derivation of title. They had the means of knowing all the material facts, and they ought to have exercised reasonable diligence in searching the transaction to the bottom. Prima facie, the title was suspicious and infirm. It was a sale by a wreck commissioner, who immediately became a purchaser, under authority of a master, who also became a purchaser at the price given at the original sale.

Upon the whole, looking to all the circumstances of the case. and having weighed the arguments of counsel with due care. my opinion is, that the sale was invalid, and convey-

ed no title to the claimants, and that therefore the decree of the district court ought to be affirmed.