SAMUEL WARD, CLAIMANT OF THE BARK MOPANG, APPELLANT, *v.* WILLIAM M. PECK, JACOB BADGER, FREEMAN KINGSLEY, AND HUMPHREY DEVEREUX, LIBELLANTS.*

The courts of admiralty of the United States have jurisdiction of petitory as well as mere possessory actions.

The cases of The Tilton (5 Mason, 465,) and Taylor v. Royal Saxon, (1 Wall, 322,) confirmed.

The abandonment of a ship by her owners to the underwriters. does not operate to ratify the title of one who claims her under an unauthorized sale by the master.

THIS was an appeal from the circuit court of the United States for the eastern district of Louisiana.

The circumstances of the case are stated in the opinion of the court.

It was submitted on the record by *Mr. Benjamin*, for the appellant, and argued by *Mr. Stanton*, for the appellees.

*Mr. Stanton* contended that the offer to abandon did.not constitute a ratification of the sale by the master, and cited Phillips on Ins. § 1576; Abbott on Shipping, 19; 18 Pickering, 83; Phillips on Ins. § 1497; 2 Peck, 249; 5 Pet. 604; 15 Mass. 341; 9 Johns. 21; 1 Caines, 573; 18 Peck, 83.

Mr. Justice GRIER delivered the opinion of the court.

The pleadings in this case present but.the single question of the title or ownership of the Bark Mopang.

Originally, the court of admiralty in England entertained jurisdiction of petitory as well as mere possessory actions. Since the Restoration, that court, through the jealous interference of courts of law, had ceased to pronounce directly on questions of ownership or property. Petitory suits were silently abandoned, and, if in a possessory action a question of mere property arose, especially of a more complicated nature, it declined to interfere.

This " submission to authority rather than reason " has continued till the statute of 3 and 4 Vict. c. 65, § 4, restored to the admiralty plenary jurisdiction of such questions. See case of The Aurora, 3 Rob. 133, 136, and the Warrior, 2 Dodson, 288, 2 Brown Civ. & Ad. 430.

In this country, where the courts of admiralty have not been subjected to such jealous restraints, the. ancient jurisdiction over petitory suits or causes of property has been retained. In. the

---

* Mr. Justice CATRON was absent on the trial of this cause.

case of The Tilton, (5 Mason, 465,) Mr. Justice Story has examined this question with his usual learning and ability. The authority of that case has never been questioned in our courts. See Taylor *v.* Royal Saxon, 1 Wall, 322. In the case of the New England Ins. Co. *v.* Brig Sarah Anne, 13 Pet. 387, in this court, the only question was the title or ownership of the brig, yet the cause was entertained without any expression of doubt as to jurisdiction.

The following agreed statement of facts presents the merits of this case : —

" That the libellants are the owners of the said Bark ' Mopang,' unless their title has been devested by the sale made by the master under the following circumstances : The bark sailed from New Orleans on or about the 29th November, 1846, for Tampico and other Mexican ports. That, on or about the 6th of December thereafter, she struck aground, was abandoned by her officers and crew on the north breakers off the bar of Tampico ; that she floated over the bar, and was boarded by one Clifton, who refused to deliver her to the master ; that a claim for salvage was made ; that by agreement between the master and Clifton, the vessel was sold to the claimant, Ward, on the ——. It is admitted that the sale to Ward was unauthorized by the circumstances in which the master was placed.

" The libellants had a valued policy upon the vessel taken out at New Orleans. On the 9th day of January, 1847, they gave notice of abandonment to the underwriters as for a total loss, who refused to accept the same. They were sued for a total loss by libellants. Judgment found for defendant."

This statement amounts to an admission of want of title in the claimant. The abandonment by her owners to the underwriters could not affect the title of the claimant, by way of ratification or estoppel. The insurance is but a wager between the parties to it, on the safety of the vessel. By the rule of the contract the ship may be abandoned, and the whole insurance claimed, when the damages exceed half the value.

Nothing but extreme necessity can justify the sale of the vessel by the master. The abandonment was based on the damage done to the vessel at the time of the accident. If accepted, the master became the agent of the insurer ; and whether accepted or not, his act, without authority, can receive no ratification from allegations or admissions made by any party in a dispute on the contract of assurance, where the inquiry as to the act of the master was irrelevant. The defendant, having obtained possession unlawfully, was a trespasser, and can no more plead the abandonment as a confirmation of his title than if he had obtained it by theft or piracy ; moreover, if the circumstances

would have justified a·sale by the master, no abandonment was necessary. It cannot, therefore, by any possible implication, amount to a confirmation of such sale.

The judgment of the circuit court is affirmed.

Mr. Justice DANIEL dissenting.

I dissent from the decision just pronounced: 1. On the ground that this case is not one regularly appertaining to a court of admiralty. 2. Because this decision professes to claim a power and jurisdiction admitted by the decision itself never to have been heretofore conceded to nor exerted by courts of admiralty in this country, whose power and jurisdiction in future, are to be traced for their origin to this cause alone.

With respect to the objection first stated; this cause presents no example of a maritime contract or of a marine tort. It is simply a contest as to the right of property in a subject situated within the ordinary and settled jurisdiction of the courts of common law and equity of the State of Louisiana, and could have been there as effectively determined by an action of detinue or trover, or by a bill in equity if there was danger of an eloignment of the subject in controversy, as it could possibly be in admiralty : and this fact alone should have been a reason sufficient against an abandonment of the adequate and familiar modes of administering justice, and an unnecessary resort to a tribunal which in England, we are told by Lord Hale, was never established either by common law or by statute, but had grown up entirely by encroachment and sufferance.

It is true that the subject in controversy here is a vessel; but if that single fact could justify the interposition of the admiralty, · it would equally imply the same power in that jurisdiction over any dispute concerning the right of property in a vessel, although she might still be upon the stocks, and although she had never reached the water, or might, by some casualty, never touch that element.

This was simply a question of property arising out of the extent of power in an agent to dispose of it — a common and every-day question of law.

2. It is admitted that the jurisdiction now asserted for the first time in this court, — namely, the jurisdiction in petitory suits — did not belong to the admiralty in England, or was not exercised by them for several hundred years at least; and that a recent statute in the present reign, had been enacted expressly to confer that jurisdiction. It has also been said, that the jurisdiction thus recently authorized, had, in the olden time, existed in the admiralty, and had been restrained or forbidden only by the jealousy of the common lawyers. This appears to me to be an

23 *

argument not founded upon the judicial history of the country, and, one which is neither logical nor tenable. A reference to others of the highest and most venerable authorities, which might be added to that of Lord Hale already cited, demolishes entirely the foundation on which this argument is based. The argument is in itself illogical and illusory; for had this jurisdiction been even legitimate in the admiralty, it might doubtless have been vindicated and maintained in despite of an illegal and unfounded jealousy of the common lawyers. It never could have been forced to yield to so baseless an opposition. No authority so potent as that of an express statute could have been required, to create what not only already had being, but which was established and venerable from justice and from lapse of time.

If the inhibition had been the mere creature of jealousy or prejudice, a returning sense of right and a conviction of public advantage, would, in this as in other instances falling within the power of the courts, have corrected previous errors. The very fact of the enactment of a statute, such as that referred to, is strong evidence to show that the jurisdiction it confers had no previous or rather no rightful existence.

But it is said that no jealousy like that once felt in England against the admiralty exists in this country; and, therefore, the inveterate powers ascribed to it formerly in England, are free and unfettered for its exercise in this country. This course of argument naturally suggests with me the following inquiries: What fetters or limitations are recognized as placed upon the admiralty jurisdiction in the United States? Freed from the checks and restraints imposed upon such a jurisdiction in that country, from which the system was transferred to us, what are the checks imposed upon it here? Are there any such checks? Does it, either in theory or in practice, recognize any such — how or where are they defined or ascertained? Has it any system at all, or is it left to the judgment or fancy of those who assume to exercise power under its name?

Too true does it seem to me the case, that the ambitious and undefined pretensions of this branch of jurisprudence, have found greater favor here than in my view, is compatible with civil liberty, with public policy or private benefit; and hence I have been the more inclined to watch and prevent its dangerous encroachments, and in all sincerity can, in contemplating the favor extended to those encroachments exclaim, "*hinc illæ lachrymæ.*"

For the jurisdiction here claimed for the admiralty, we are referred to the treatise of Mr. Arthur Brown, professor of civil law in Ireland. I have no recollection of having before seen or

Ward *v.* Peck et al.

heard the doctrines of this professor recognized as authority; and with respect to his theories, it may justly be remarked, that if these are to be adopted as law, there is no excess of extravagance to be found in the exploded notions of Sir Leoline Jenkins, or anywhere else, which will not find an apology, nay, a full justification, in the book of this civil-law doctor. If the theories of this professor are to be regarded as binding, his disciples may look forward at no distant day to an announcement from this bench, as there has been formerly from that of one of the circuits, of the doctrine, that a policy of insurance (a mere wager laid upon the safety of a vessel) is strictly and essentially a maritime contract, because, forsooth, the vessel had to navigate the ocean.

It seems somewhat singular, however, that Mr. Brown should be appealed to in support of the authority now claimed for the admiralty, when in truth his book again and again admits, that such jurisdiction had been utterly repudiated in England as a sheer usurpation, and may appropriately be styled a jeremiad over the lost authority and splendor of a system which he would exalt to the control of every other branch of jurisprudence.

I object, in all cases, to the decision of questions not strictly in point, or which have not been regularly discussed, and not only maturely but necessarily considered. If there is any one source of embarrassment more prolific than all others, it is this very practice. I cannot perceive the necessity nor the propriety of deciding matters in advance. The effect of such a practice is either the difficulty of getting clear of irregular and inapposite conclusions, or the sanction of them with the view of maintaining consistency whether right or wrong.

A great portion of the admiralty jurisdiction now permitted in this country, may be traced to a *dictum* in argument in the case of The General Smith, 4 Wheat. p. 444, in the assertion of a doctrine which, if now for the first time discussed and examined, might not command the sanction of this tribunal.

It is that tendency of error once countenanced or tolerated to grow into precedent, which has ever enjoined it upon me as a sacred duty to resist its approaches before they have been matured into power; and even the conviction of an inability to accomplish this result, is with me no dispensation from the duty of resistance.