WILLIAM PETERS
vs.
JEREMIAH T. SPEIGHTS.
} MARCH TERM, 1853.

[SALE OF VESSEL IN FOREIGN PORT—PRIMAGE—ALLOWANCE TO SEAMEN DISCHARGED IN A FOREIGN PORT.]

THE complainant and defendant were joint owners of a vessel, which sailed from Baltimore to San Francisco, the former owning three-fourths, and the latter one-fourth thereof. The defendant was also the master of the vessel, and when she sailed from Baltimore held a power of attorney from complainant to sell his share when she arrived in San Francisco. This power and authority the complainant afterwards, and before the vessel arrived at her destination, revoked and transferred the same to other parties, his agents in San Francisco. These agents with the concurrence of defendant offered the vessel at public auction upon her arrival in San Francisco, and the defendant became the purchaser. HELD—

That under all the circumstances of the case the relation in which the parties stood at the time of the sale, did not preclude the defendant from becoming the purchaser of the vessel, the relation of trust and confidence between them having been destroyed by the complainant himself, by confiding the power to dispose of his interest in her to other parties.

The purchase of a ship in a foreign port by the master is generally to be considered as made for the benefit of the owners if they elect so to regard it; the incapacity of the master to purchase in such cases, arises from the relation of trust and confidence, which exists between him and the owners.

Primage is an allowance by the shippers to the master for his care bestowed upon their property on board the vessel, with which the owner of the vessel has no concern, and which the master receives to his own use, unless he has otherwise agreed with the owners.

As a general rule, a seaman is entitled to receive the whole of his stipulated wages for the entire intended voyage if he has faithfully performed his duty, and no disaster has rendered his services unproductive to his employer, but this rule as a general thing is inapplicable to the master.

[The allegations of the bill and the answer in this case will be found stated in 9 *Gill*, 472, where the appeal from the order of Baltimore County Court, in the equity side of which the bill was filed, overruling the motion to discharge the receiver, was affirmed, and the cause remanded for further proceedings. It was subsequently removed to the Court of Chancery. The evidence and the other proceedings in the cause are sufficiently stated in the following opinion of the Chancellor.]

THE CHANCELLOR:

The facts alleged on the one side, and the other by the pleadings in this case are sufficiently stated in the report of the cause in 9 *Gill*, 472, upon the appeal from the order refusing to discharge the receiver, and need not be again repeated. So far as the opinion then delivered by the Court of Appeals is applicable to the case as it now stands, this court, of course, deems itself bound to conform to it.

I understand that opinion to have decided that these parties in the adventure which has given rise to the present controversy were partners, and that the partnership was dissolved by the sale of the vessel at San Francisco in August, 1850. In speaking of the conduct of the defendant as developed by the pleadings and proofs in the case at that time, the court, avoiding the expression of an opinion which should control the ultimate decision of the cause, say, that in the transactions at San Francisco he acted precipitately, and under great excitement, for which, however, they intimate there was provocation. That he assented to, if he did not coerce, a sacrifice of the vessel. He bought the vessel himself, and the agent of the plaintiff, in his testimony, charges him expressly with precipitating the sale before the cargo was discharged. Yet the fair character of the purchase, and the price paid seems to be fully sustained by other testimony, though he sold the vessel soon after for twice the amount, and the court then expressly waive, at that stage of the cause, the decision of the question touching the effect upon the sale of the fiduciary relation which has existed between the parties.

A good deal of evidence has been taken on both sides since

the cause was remanded for further proceedings by the Court of Appeals, and this proof, with all the proceedings, has been carefully considered, and the conclusion to which I have come is, that under all the circumstances of the case, the relation in which the parties stood at the period of the sale of the vessel, in August, 1850, did not preclude the defendant from becoming the purchaser of the vessel.

It is quite evident from the second letter of the defendant, under date the 15th of August, 1850, that it was written under high excitement, and there are expressions in it indicative of a determination to sell the vessel at once at any price. But in my opinion it is equally clear, from the proof now in the cause, that Messrs. Winter & Latimer, the parties who held the letter of attorney from the complainant to sell his interest in her, were quite as much if not more to blame (if blame be imputable to any one) than the defendant, for bringing her into market at the time and in the mode in which she was sold.

That they could have controlled the sale at that time is manifest, and though Latimer in his proof speaks of the time and mode selected as injudicious, there is no intimation anywhere that they communicated their opinion upon the subject to the defendant. When the defendant left the port of Baltimore, he held a power of attorney from the complainant to dispose of his interest in the vessel. After his departure, from some unexplained cause, the complainant chose to delegate this authority to Mr. Lippincott, who transferred the power to Winter & Latimer, and the evidence of Mr. Cannon, the auctioneer who made the sale, is explicit that it was made by order of that firm. There can certainly be no doubt that the defendant not only concurred in but pressed the sale on, but I am far from thinking that all the consequences resulting from disposing of the vessel at that time, and in the mode selected, should be visited upon him, when it is undeniable that the parties who held the letter of attorney of the complainant never intimated to him a doubt of the propriety of disposing of the property in that way, and at that time, but, on the contrary, gave the auctioneer orders to make it.

If the complainant had permitted the power which he had given the defendant to stand unrevoked, and in the exercise of the authority thus confided to him, he had acted precipitately or unwisely, or at all events had attempted to make profit to himself in the discharge of his trust, there can be no doubt a court of equity would have afforded redress to the injured party. But when this authority was withdrawn, and the power entrusted to another party, it would certainly be a hard measure of justice to hold the person from whom the power was taken responsible for the conduct of him to whom it was given.

Winter & Latimer were the agents of the plaintiff in making this sale, and they, knowing who was the purchaser, received the purchase money from the auctioneer employed by them without objection or complaint. This appears from the evidence of the auctioneer, and the entries upon his books returned with the commission.

I cannot conceive that the defendant should or can, with any propriety, be regarded as the complainant's agent in selling this vessel, and, therefore, it appears to me there is no principle of law which precluded him from purchasing. I am also quite satisfied that if he had not attended the sale and bid, she would have sold for less than he gave for her, thus inflicting an injury upon himself as well as upon the complainant. Surely there can be no rule of law which would require him to stand by and permit his own property to be sacrificed under such circumstances.

It is no answer to say, that he might have bid on account of himself and the complainant to prevent a sacrifice. He had no authority from the plaintiff to do so, and might at the election of the latter been held to his bid.

The counsel for the complainant has pressed with much force the circumstance that the vessel was in bad repute in the place of sale, and that the respondent is responsible to some extent for this. But I do not find in the evidence anything to lead to a suspicion that the defendant contributed to or even knew of the reports in circulation injurious to the character of the vessel, and, therefore, he cannot be affected by their existence. It is very certain that but for the defendant's going to the place

of sale and bidding, the barque would have sold for less than she actually brought. That she subsequently commanded a much better price is conclusively shown to have resulted from a circumstance which could not have been foreseen.

The cases relied upon to show the invalidity of the purchase of this vessel by the defendant, do not, in my opinion, support the proposition for which they are cited. In the case of *Church* vs. *The Marine Ins. Co.*, 1 *Mason*, 341, the vessel was sold by the master himself at public auction, after she was stranded, and he became the purchaser. There, as said by Mr. Justice Story, nothing could be clearer than that he could not become a purchaser. He was both vendor and vendee. In the case of the *Schooner Tilton*, 5 *Mason*, 465, the same judge, speaking of sales made by a wreck commissioner, and asserting their incapacity to purchase, says, the same principle applies with as much, if not more force to the master, when he acts as the agent of all concerned, under an authority superinduced by an urgent necessity in the course of the voyage. Even after the sale the conduct of the wreck commissioner or the master, in buying from the first purchaser, will be watched with suspicion, and nothing but the most entire good faith, *uberrima fides*, on their part, will save the sale.

And the case of *Chamberlain* vs. *Harrod*, 5 *Greenleaf*, 420, is merely an affirmance of the admitted principle that the purchase of a ship in a foreign port, by the master, is generally to be considered as made for the benefit of the owners, if they choose so to regard it. The incapacity of the master thus to purchase, arises, say the court, in this last case, "from the relation of trust and confidence which exists between them." But in the case now under consideration, the relation of trust and confidence did not exist. That had been destroyed by the complainant himself, when he thought proper to confide the power to dispose of his interest in the vessel to another. And although it may be said that the defendant was in favor of and even urged the sale, yet there can be no doubt, I think, that Winter & Latimer, the complainant's agents, must be regarded as the parties by whom it was made, and that whatever they

may have thought of the expediency of selling at that time, and in the mode adopted, they did not give the defendant the benefit of their greater experience and knowledge on the subject.

Some circumstances have been relied upon to show that the defendant, even after the purchase on the 26th of August, 1850, did not regard the vessel as belonging to him, such for example, as hiring seamen and charging their wages to the joint concern. This, certainly, he had no right to do, but I cannot persuade myself he meant by it to show or admit that he did not claim to be the exclusive owner of the vessel after the sale. He paid the purchase money to Winter & Latimer, the plaintiff's agents, and resold without any consultation with them.

I do not think, therefore, the complainant has a right to treat the first sale as a nullity and to participate in the profits upon the resale.

The next question relates to the right of the defendant to charge commissions on the freights collected by him in San Francisco.

The evidence of Holmes, the clerk of the complainant, is directly opposed to any such charge, and that of Nicholson, one of the former joint owners of the vessel is equally explicit upon the point, during the period of his ownership. This proof, in my opinion, is sufficient to overrule the answer. It is true, the evidence of Nicholson does not relate to the voyage to San Francisco, but it may, I think, be referred to in corroboration of the proof of Holmes, which is positive and unequivocal that the defendant, for his services upon this identical voyage, was to receive no compensation beyond his pay, which was to be at the rate of fifty dollars per month. The agreement on the part of the defendant to make no charge for his services in the foreign port, was founded on a valuable consideration, as shown by Holmes. This consideration was a corresponding agreement by the complainant to charge nothing for his services as agent and ship-husband in Baltimore, a stipulation which he faithfully complied with, it appearing by the proof that he collected

freight in Baltimore amounting to upwards of five thousand dollars, and made disbursements exceeding four thousand dollars, for which he made no charge. Under these circumstances the defendant cannot be allowed to charge as against Peters any thing for his services on the voyage, or at San Francisco, in collecting freights beyond his pay as master of the vessel.

But I do not understand the agreement to have any thing to do with the charge of primage. This is a matter between the master and the owners of the merchandise shipped on board the vessel. The word primage, says *Abbott on Shipping*, 492, "denotes a small payment to the master for his care and trouble, which he is to receive to his own use, unless he has otherwise agreed with his owners." His agreement with the complainant, in this case, was, that they, master and owner, reciprocally should make no charge, the one against the other, for services in the home and foreign port, but it cannot be understood as extending to a small compensation to the master for his care and trouble bestowed upon the property of the shippers on board the vessel with which the owner had no concern. The master, to be sure, has no right to bring this charge into the accounts between himself and the complainant, and if he has done so, they must, in that respect, be corrected.

The opinion of the court is also asked touching the defendant's right as master of the barque to charge for his pay as such to the period of his return to Baltimore, and for his expenses incurred in returning. The case of the master is unlike that of the seaman. The latter, as a general rule, is entitled to receive the whole of the stipulated reward for the entire intended voyage, if he has faithfully performed his duty, and if no disaster has rendered his services unproductive to his employer; but the rule, as a general thing, is inapplicable to the situation and character of the master, and the act of congress of the 28th of February, 1803, ch. 62, which, when the seamen are discharged abroad with their own consent, or the ship is sold, provides that three months additional pay shall be allowed, does not embrace the case of the master. *Abbott on Shipping*, 619.

There is nothing in this case to exempt the master from the operation of the general rule. In the sale of the vessel he concurred and himself became the purchaser, realizing a large profit upon the resale, and though I think the sale was, in a measure forced upon him by the conduct of the complainant, and that it was made by the agents of the latter, still his willingness, under the circumstances, that it should take place, and his buying himself, is quite sufficient to deprive him of the title to pay after that period, if under a different state of facts the rule with regard to seamen would be applicable to him.

My opinion, therefore, is, that his claim to wages as master of the vessel, must terminate with the sale in August, 1850, when he became the purchaser. That from that time all the expenses of the vessel must be borne by him, and that as all connection between him and the complainant was then dissolved, he must defray his own expenses home.

The case will be sent to the Auditor to state an account, in conformity with the views hereinbefore expressed.

S. T. WALLIS, for Complainant.
CHAS. F. MAYER, for Defendant.